05-6949-cr
United States v. Mahamed

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2006

(Argued: May 4, 2007                          Decided: September 19, 2008)
(Petitions for Rehearing Decided: August 21, 2009)

Docket No. 05-6949-cr

Amended Opinion

_____

UNITED STATES OF AMERICA,

Appellee,

v.

ABDIRASHID MOHAMED HASSAN,

Defendant-Appellant.

_____

Before: CALABRESI and POOLER, Circuit Judges.*

_____

Defendant-Appellant Abdirashid Mohamed Hassan appeals from the November 28, 2005

judgment of the United States District Court for the Eastern District of New York (Garaufis, J.),

convicting him, following a jury trial, of one count of conspiracy to import cathinone, in

_____

* The Honorable Sonia Sotomayor, originally a member of the panel that decided this case, was elevated to the Supreme Court on August 8, 2009. The two remaining members of the panel, who are in agreement, have determined the matter. See 28 U.S.C. § 46(d); Local Rule 0.14(2); United States v. Desimone, 140 F.3d 457 (2d Cir. 1998).

violation of 21 U.S.C. §§ 952(a), 963, one count of conspiracy to distribute and to possess with intent to distribute cathinone in violation of 21 U.S.C. §§ 841(a), 846, one count of conspiracy to launder money in violation of 18 U.S.C. § 1956(a)(1), (h), and forty-one substantive counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1).  Because we conclude that the evidence was insufficient to convict Hassan of the forty-one substantive counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1), we REVERSE the judgment on these counts, and direct the district court to enter an order of acquittal.  Because we conclude that the district court made a fundamental error in its jury instructions, we now VACATE the judgment as to the remaining counts.  This opinion replaces in its entirety our earlier decision in United States v. Hassan, 542 F.3d 968 (2d Cir. 2008) ("Hassan I").

> IRA M. FEINBERG, Hogan & Hartson, L.L.P., New York, NY, for Defendant-Appellant.
>
> MARY K. BARR, Assistant United States Attorney (Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Barbara D. Underwood, Counsel to the United States Attorney, on the brief), Brooklyn, NY, for Appellee.

_____

POOLER, Circuit Judge:

Defendant-Appellant Abdirashid Mohamed Hassan appeals from the November 28, 2005 judgment of the United States District Court for the Eastern District of New York (Garaufis, J.), convicting him, following a jury trial, of one count of conspiracy to import cathinone, in violation of 21 U.S.C. §§ 952(a), 963, one count of conspiracy to distribute and to possess with intent to distribute cathinone in violation of 21 U.S.C. §§ 841(a), 846, one count of conspiracy to

launder money in violation of 18 U.S.C. § 1956(a)(1), (h), and forty-one substantive counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1).  On appeal, Hassan argues that:  (1) the district court erred in its instructions to the jury; (2) the statute and regulations governing cathinone do not provide fair warning as to what conduct is unlawful; (3) the evidence was insufficient to support his convictions; (4) the government's failure to correct false and misleading testimony denied him a fair trial; (5) trial counsel provided ineffective assistance; (6) the district court erred in admitting a chemist's testimony and exhibits regarding the testing of three samples of khat; and (7) the district court's sentencing determination was erroneous and unreasonable.  Because we conclude that the evidence was insufficient to convict Hassan of the forty-one substantive counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1), we REVERSE the judgment on these counts, and direct the district court to enter an order of acquittal. Because we conclude that the district court made a fundamental error in its jury instructions, we now VACATE the judgment as to the remaining counts.[1]

---

[1] As noted, this amended opinion replaces in its entirety our earlier decision in United States v. Hassan, 542 F.3d 968 (2d Cir. 2008) ("Hassan I"), to which both parties petitioned for rehearing.  Having reviewed the petitions, we have concluded that each presents at least one valid ground for granting rehearing and have amended the opinion accordingly.  We grant Hassan's request that we consider the sufficiency of the evidence for the single count of money laundering conspiracy because we agree that we are required to reach that issue since Hassan's retrial would be barred by Double Jeopardy if the evidence presented by the government was insufficient.  See United States v. Riggi, 541 F.3d 94, 108 (2d Cir. 2008).  We  conclude that the trial evidence was sufficient to support a conviction on this count.  We decline Hassan's invitation to revisit our conclusion that the trial evidence was sufficient to prove that he was dealing with khat containing cathinone.  We grant the government's request that we amend the opinion's description of the elements of a Controlled Substances Act ("CSA") conspiracy and have deleted that language in Hassan I indicating that there is an overt act requirement for conspiracies charged under the Controlled Substances Act ("CSA").  See United States v. Shabani, 513 U.S. 10, 15 (1994).  We also grant the government's request that we amend the opinion to clarify that "scienter with respect to the type and quantity of controlled substance is not required to convict a defendant under the CSA," Gov't Pet. for Reh'g at 5-6, but make only limited amendments as we think our

3

# I. BACKGROUND

## A. Khat

Hassan was convicted of controlled substance and money laundering offenses involving cathinone, a stimulant that is sometimes present in "khat." Khat is the leaf of the plant <u>catha edulis</u>, a shrub that grows in parts of East Africa and the Arabian Peninsula. <u>See</u> United States Food and Drug Administration, Basis for the Recommendation for Control of Cathinone into Schedule I of the Controlled Substance Act 9 (Nov. 5, 1992) [hereinafter "FDA Report"]; <u>United States v. Hassan</u>, 03-cr-567, slip op. at 1 (E.D.N.Y. Oct. 12, 2005). "The plant's leaves are chewed or brewed in tea and, once ingested, produce a stimulant effect on the central nervous system." <u>Id.</u>

While "khat is . . . ingested as regularly in East African countries (such as Somalia, where the defendant is from) as coffee is ingested in the United States," <u>id.</u> at 8, the two stimulants that can sometimes be found within khat, cathinone and cathine, have nonetheless been deemed "controlled substances" under United States law, <u>see</u> 21 C.F.R. §§ 1308.11(f), 1308.14(e); <u>see also</u> 21 U.S.C. § 812. Cathinone, which has properties similar to those of amphetamines, is the stronger of the two substances. It is "very unstable" and "rapidly decomposes into less potent substances," including cathine. <u>See</u> FDA Report at 9. According to the Drug Enforcement Administration, "[w]ithin 48 hours of harvest Khat's chemical composition breaks down and at

---

decision read as a whole makes clear that we adhere to that rule. However, we deny the government's request that we revisit our conclusion that a "conviction based on cathine, rather than cathinone, would have been an impermissible constructive amendment of the indictment." <u>Hassan I</u>, 542 F.3d at 991. We adhere to that conclusion. <u>See</u> <u>United States v. Abdulle</u>, 564 F.3d 119, 126-27 (2d Cir. 2009) (explaining why conviction based on cathine, rather than cathinone, is constructive amendment rather than variance). We deny the government's and Hassan's petitions in all other respects.

4

that point Khat contains only Cathine, the schedule IV substance." U.S. Drug Enforcement Administration, Fact Sheet, Khat, AKA: Catha Edulis, http://www.dea.gov/pubs/pressrel/pr072606a.html (last visited August 10, 2008); see also FDA Report at 11-12 ("Khat leaves have been reported to lose their effect within . . . three days after harvesting."); Hassan, 03-cr-567, slip op. at 1 ("When the leaves are first cut, they contain a stimulant called cathinone. Over a period of approximately 48-72 hours, the cathinone in the plant degrades into cathine, a milder stimulant."). Moreover, according to a recent article in the Journal of Drug Issues, "[a]ny claim that khat always contains cathine is unsubstantiated." Edward G. Armstrong, Research Note: Crime, Chemicals, and Culture: On the Complexity of Khat, 2008 J. Drug Issues 639. Additionally, as the Fourth Circuit has noted: "At this juncture, there is no reasonable basis for the conclusion that khat always contains cathine." Argaw v. Ashcroft, 395 F.3d 521, 526 (4th Cir. 2005).

Khat itself is not a controlled substance under United States law. However, khat is subject to an unusual and, indeed, unique dual regulatory scheme that employs a distinction based upon the chemical composition of khat. "When khat contains cathinone, khat is a Schedule I substance," and "[w]hen khat does not contain cathinone, but does contain cathine, khat is a Schedule IV substance." Schedules of Controlled Substances: Placement of Cathinone and 2,5-Dimethoxy-4-ethylamphetamine Into Schedule I, 58 Fed. Reg. 4316, 4317 (Jan. 14, 1993); see also United States v. Caseer, 399 F.3d 828, 833 (6th Cir. 2005) ("[N]either the U.S. Code nor the Code of Federal Regulations controlled substances schedules refers to the plant from which cathinone is derived, Catha edulis, commonly known as 'khat.'"); Argaw, 395 F.3d at 527 ("[K]hat is not a controlled substance . . . ."); United States v. Hussein, 351 F.3d 9, 17 (1st

5

Cir. 2003) ("[K]hat, unlike cocaine, is not a controlled substance per se . . . ."). Importation or distribution of cathinone, the Schedule I substance, is subject to a maximum penalty of twenty years, see 21 U.S.C. § 960(b)(3) (importation); 21 U.S.C. § 841(b)(1)(C) (distribution), while importation of cathine, which was "temporarily" placed on Schedule IV in 1988,[2] see 53 Fed. Reg. 17,459 (May 17, 1988), is subject to a maximum penalty of five years, see 21 U.S.C. § 960(b)(4); see also 21 U.S.C. § 841(b)(2) (maximum penalty for possessing cathine with intent to distribute is three years' imprisonment).

## B.    Hassan's Trial

### 1.    The Evidence

The evidence at trial demonstrated that Hassan had been importing khat into the United States for several years with the assistance of a United States Customs broker named Patrick Fuller. Fuller provided Hassan with counterfeit customs stamps, which helped release goods from United States Customs quickly and without inspection. Hassan's khat shipments were falsely labeled as printed matter, or similar material, and used fake return addresses. Hassan, who was first introduced to Fuller in 1997 or 1998, was one of Fuller's principal clients. Fuller estimated that he helped Hassan import two to three shipments of khat per week, and Hassan paid Fuller $1,500 for each successful shipment. Hassan also took Fuller to London and introduced him to a man named Omar Hashi who told Fuller that he was Hassan's khat supplier.

Fuller worked with several other khat importers, including a man named Mohamed

_____

[2] Hassan argues that cathine's listing as a controlled substance is no longer valid because a temporary listing cannot substitute indefinitely for the required rulemaking process. Because Hassan was not charged with a cathine offense, we do not reach this issue.

Hassan -- no relation to defendant -- who cooperated with the government [hereinafter "the cooperator"]. The cooperator testified that, like a number of other khat importers, he regularly took waybills to Fuller to be stamped with the counterfeit customs stamps. In 2002, another khat importer, Ahmed Mussa, introduced the cooperator to a man named Leban. The cooperator met with Leban several times, but, ultimately, the two did not successfully negotiate a deal. The cooperator later identified defendant Hassan as Leban in a photo array; however, when asked to identify Leban in the courtroom during trial, the cooperator failed to identify defendant Hassan as Leban.

Prior to his arrest in 2003, Hassan had two khat-related encounters with law enforcement authorities. On April 4, 2001, Hassan was briefly detained at John F. Kennedy Airport ("JFK") when he and another individual tried to pick up two shipments of khat from a cargo facility. At the time, Hassan told United States Customs Special Agent Paul Kastava that he thought that khat was legal in the United States, because it was legal in Great Britain. In response, Special Agent Kastava informed Hassan that khat is illegal in the United States.[3] However, Kastava did not inform Hassan that khat is illegal because it is, or can be, a <u>controlled substance</u>. Rather, he simply told Hassan that khat is illegal.

Although the shipment of khat was seized, Hassan was not arrested. The government argues, and the district court found, that testimony about this encounter supports the argument that Hassan knew "that khat contains a controlled substance." <u>Hassan</u>, 03-cr-567, slip. op. at 12. Hassan, on the other hand, argues that this encounter actually supports his assertion that he was

_____

[3] Kastava thus misstated the law regarding khat to Hassan. Khat itself is not illegal, rather, only khat containing cathinone or cathine is illegal. <u>See</u> <u>supra</u> Part I(A).

not aware that khat is, or can be, a controlled substance in the United States. Special Agent Kastava did not state that khat was a controlled substance, and Hassan was not arrested, although one would expect to be, if caught importing controlled substances into the United States by a United States Customs Agent. Thus, Hassan argues that his encounter at JFK with Special Agent Kastava merely proves that he was aware that importing khat violates U.S. Customs laws.

Hassan's second encounter with law enforcement regarding khat was on May 9, 2002, at a bond hearing for fellow khat importer Ahmed Mussa. Having been caught importing khat into the United States, Mussa was not charged with violating United States drug laws, but rather was charged with importing merchandise into the United States, by means of a false statement to Customs, in violation of 18 U.S.C. § 542. Hassan, who described himself as a friend of Mussa's family who did not know Mussa himself, testified briefly at the hearing and co-signed a bond on Mussa's behalf. The bond did not identify the charges against Mussa. During the hearing, the prosecutor and Mussa's attorney both made reference to the fact that "the underlying conduct here was importation of drugs" and "the underlying offense involves drugs."

Hassan was arrested on April 16, 2003. Investigating agents from the Bureau of Immigration and Customs Enforcement traced a United Parcel Service ("UPS") delivery of khat to an office building at 19 West 22nd Street in New York City (the "office building"). Immediately after the package was delivered by the UPS driver, and signed for by co-defendant Mahamed Mahamed (the "co-defendant"), Special Agent Stephen Lee went to the office building and asked the co-defendant to take him to the UPS package. The co-defendant showed Special Agent Lee the package, which had been placed on the floor of a closet adjacent to the office building's lobby. In response to questioning, the co-defendant told the investigating agents that

8

Hassan was responsible for arranging shipments of khat to the office building, that the co-defendant would sign for the packages, and that the two men would split the contents. Hassan arrived shortly thereafter and was arrested. Hassan initially told the agents that he was at the office building to pick up a key to the co-defendant's residence, where a sick relative was staying. After further questioning, Hassan acknowledged that he had previously run into trouble with U.S. Customs when he tried to pick up khat at Newark Airport.[4]

After he was arrested, Hassan allowed agents to search his backpack and apartment. Among other things, the backpack contained $12,642 in cash, a UPS airway bill addressed to the office building, and receipts for postal money orders. The backpack also contained notebooks and date books which appeared to be records of khat transactions, listing names of couriers and known co-conspirators, city names, and calculations. In Hassan's apartment, investigating agents found more money order receipts and UPS air waybills addressed to the office building, as well as a luggage tag bearing the name and address of an individual who had been arrested three months earlier at JFK for smuggling khat in his luggage. After Hassan's arrest, investigating agents obtained additional records of money orders purchased by Hassan between December 21, 1998, and May 15, 2000, payable to his khat supplier in London, Omar Hashi.

At trial, the government offered evidence attempting to connect Hassan to other importations of khat. A customs officer testified that on June 3, 2000 he had seized khat from the bags of Robert Lightbody, a citizen of the United Kingdom, who was attempting to enter the United States at JFK. Customs records showed that an individual of the same name also arrived

---

[4] As stated previously, it was actually at JFK, not Newark, that Hassan had run into previous trouble with U.S. Customs.

in the United States on November 8, 1999; Lightbody's name appeared in one of Hassan's calendars for that date, along with the notation "Lightbody, 400 plus 120."

The government also presented the testimony of a Drug Enforcement Administration ("DEA") chemist, Brian Hall. Hall testified about analyses he performed on three packages of khat to determine the chemical composition of the khat, i.e., whether the khat contained either cathinone or cathine. Hall did not analyze the package of khat that was seized the day that Hassan was arrested, and thus provided no testimony as to the chemical composition of that khat shipment. Instead, Hall testified about three packages of khat that the DEA had seized after Hassan was arrested. None of the packages were addressed to Hassan. However, the first package was apparently seized at the office building. The other two packages were seized at a UPS facility. Hall testified that each of the samples that he tested from these three packages contained both cathinone and cathine. He also testified that cathinone, which cannot be detected without chemical testing, begins to lose its potency within 48 to 72 hours, when it starts to break down into cathine.

### 2.    *Procedural History*

The case was tried before a jury from July 11, 2005, to July 14, 2005. On the first day of trial, Hassan filed a motion in limine seeking to prevent the prosecution or its witnesses from stating, inter alia, that khat is a controlled substance. The government conceded that "khat in and of itself, without any cathinone[,] is not necessarily a controlled substance," but pointed out that khat "may contain" cathinone. The district court ruled that the government "would not be permitted to introduce evidence that khat per se is a controlled substance." Hassan, 03-cr-567, slip. op. at 15. Nothwithstanding this restriction, a number of individuals testified throughout the

10

trial that khat is, in fact, a controlled substance. Among these were several law enforcement personnel. Special Agent Kastava testified that to his "understanding" khat is "an illegal substance in the United States." Special Agent Lee testified that Hassan was arrested for "[c]onspiracy to import khat," answered affirmatively that khat is a "narcotic" and "is on the controlled substance list," and stated that "I'm familiar with khat . . . and I'm familiar that it is illegal to bring khat into the United States." Special Agent David Villanucci, a Special Agent with the Immigration Customs Enforcement, testified that he arrested Hassan for "[i]mportation of khat" and another individual for "attempting to import khat." Ralph Cafasso, an officer with the United States customs and border protection service, testified that khat is "an illegal substance."

In addition to the testimony of several law enforcement officers to the effect that khat itself is illegal because it is a controlled substance, the customs broker Patrick Fuller also testified to the effect that khat itself is illegal in the United States because it is a controlled substance. He testified that he pleaded guilty to "[c]onspiracy to import khat," that khat is "a controlled substance, so that falls under drugs," and that "my charges is [sic] conspiracy to import khat." Additionally, the cooperator indicated that he pleaded guilty to "importing forbidden stuff to the United States." When asked to clarify what he meant by "forbidden stuff," the cooperator responded, "[t]he khat."

While Hassan's trial counsel did not explicitly object to this testimony, he did try to highlight the inaccurate nature of this testimony through his cross-examination. After hearing Special Agent Lee inaccurately testify that khat is illegal in the United States because it is on the controlled substance list, Hassan's attorney sought to contradict Special Agent Lee's testimony to

11

this effect by presenting the actual wording of the Controlled Substances Act to the witness. However, after the prosecutor objected to this line of questioning, stating that it "is beyond the scope of my direct," the district court sustained the government's objection. In response to the district court's decision to sustain the objection, Hassan's counsel asked to "respond for the record." However, the district court denied this request, stating, "[w]e'll put it on the record later. Let's keep going." Later in the trial, after Fuller also testified that khat is a controlled substance, Hassan's counsel again tried to undermine these statements by questioning Fuller about the chemical composition of khat. Again, the government objected to this questioning, and the district court sustained the government's objection.

At the close of the government's case, Hassan moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29(a). The district court denied the motion, but deferred consideration of Hassan's constitutional challenge to the regulatory scheme for post-trial briefing. Hassan rested without presenting a defense case.

At the charging conference, defense counsel objected to the following language in the proposed jury charge for Count One:

> While you must find that the defendant knew it was drugs he was conspiring to bring into the United States, you need not find that the defendant knew or believed that it was cathinone, as long as the government proves that he knew and intended that some controlled substance would be imported into the United States.

Defense counsel argued that this charge was far too broad, because the government's burden was to prove that Hassan intended to import or distribute cathinone, and not merely khat. The court overruled these objections, but agreed "in the interest of fairness" to change the instruction slightly to indicate that the jury need not find that the defendant believed he was importing "a

12

drug called" cathinone.  The charge as delivered also contained the following language, which the government characterizes as a "reminder that cathinone was the controlled substance at issue in the case":

> While you must find that the defendant knew it was a controlled substance he was conspiring to bring into the United States, you need not find that the defendant knew or believed that it was a drug called cathinone, as long as the government proves that he knew and intended that some controlled substance would be imported into the United States.  As I told you earlier, cathinone is a controlled substance.

Similar language in the charge for Count Two was not modified after trial counsel's initial objection.  After brief deliberations, the jury found Hassan guilty on all counts.

Following his conviction, Hassan moved again for a judgment of acquittal under Rule 29 and also for a new trial under Rule 33.  Fed. R. Crim. P. 29, 33.  On October 12, 2005, the district court denied these motions in a written opinion. Hassan, 03-cr-567, slip. op. at 1-18. Relying primarily upon the First Circuit's decision in United States v. Hussein, 351 F.3d 9, 17 (1st Cir. 2003), the district court rejected Hassan's due process challenge to the statutory scheme, because it found that the statutory requirements regarding specific intent mitigated any vagueness in the regulatory scheme for khat.  Hassan, 03-cr-567, slip. op. at 8-9.  The district court concluded that the government had offered sufficient evidence to satisfy the intent element, namely: (1) Hassan "expended great effort to conceal the khat he imported into the United States from law enforcement;" id. at 11, (2) Hassan "made efforts to import khat into the United States as quickly as possible;" id. at 12, and (3) Hassan "was informed on two occasions that khat contains a controlled substance," id.  Finally, the court concluded that the evidence was sufficient to sustain the money laundering charges, because Hassan's notebooks "recorded his

13

khat sales," Hassan's Social Security statements and tax returns showed that the value of the money orders purchased exceeded his declared income, and the jury could infer that Hassan knew "that these financial transactions involved proceeds of some form of unlawful activity" because Hassan made "efforts to conceal his actions from law enforcement."

In his Rule 33 motion, Hassan argued that he should be granted a new trial because the government had repeatedly violated the court's pre-trial ruling by referring to khat as a controlled substance and discussing cathine. The district court rejected this argument on several grounds. First, the district court found that the examples cited by Hassan were "not direct violations of the in limine order." Second, the district court concluded that, even if the order were deemed violated, Hassan had not carried his burden, because it would not be a manifest injustice to let the verdict stand in light of the substantial evidence of his guilt. Third, the district court found that Hassan had "effectively waived" any objection pursuant to Rule 33, by failing to object at trial to the relevant testimony and by failing to request a limiting instruction on this issue.

The district court sentenced Hassan to eighty-seven months' imprisonment and three years of supervised release on each count, to run concurrently, and imposed a special assessment of $4,400. The court also ordered a $21,100 forfeiture.

This appeal followed. We agreed to consider the case on an expedited basis, and, in an order filed on May 9, 2007, after oral argument, we granted Hassan's motion for bail pending appeal. See 18 U.S.C. § 3143(b). We now reverse the judgment of the district court as to the forty-one substantive counts of money laundering in violation of 18 U.S.C. § 1956(a)(1) because we find that the evidence was insufficient to sustain those convictions, and vacate the judgment of the district court on the remaining counts, because we find that the district court made a

14

fundamental and prejudicial error in its jury instructions.

## II. DISCUSSION

Almost all of the issues raised by Hassan in this appeal are intertwined in that they all implicate scienter. Thus, while sufficiency of the evidence is a threshold issue that may obviate other challenges, see United States v. Allen, 127 F.3d 260, 264 (2d Cir. 1997), we begin here by addressing Hassan's due process challenge, because we believe it helps frame the key issues raised in Hassan's appeal. Cf. Caseer, 399 F.3d at 832-33 (addressing vagueness first); Hussein, 351 F.3d at 13 (same).

## A. Due Process Challenge

### 1. Standard of Review

We review de novo challenges to the constitutionality of a statute. United States v. Giordano, 442 F.3d 30, 38-39 (2d Cir. 2006).

### 2. The Controlled Substance Act is Not Unconstitutionally Vague as Applied to Hassan

Hassan contends that the Controlled Substance Act ("CSA") is unconstitutional as it applies to khat, 21 U.S.C. § 841, because it violates the Due Process Clause of the Fifth Amendment by failing to provide the defendant with fair warning that his conduct is unlawful. Specifically, Hassan argues that a person of ordinary intelligence would not be able to determine -- even upon close inspection of the relevant statute and regulations -- that the importation or distribution of khat is unlawful, that khat may contain a controlled substance, the nature of that controlled substance, or the seriousness of a khat-related offense. Hassan roots his argument in

15

the fact that the CSA does not explicitly mention the word "khat" while other botanical sources are listed in the CSA; that the chemicals that are mentioned in the CSA relating to khat -- cathinone and cathine -- are obscure and unknown to the average person; and that because cathinone rapidly deteriorates into cathine, it is impossible to know without chemical testing whether these chemicals are present in any particular supply of khat. Furthermore, Hassan notes that the obscurity of the CSA as it relates to khat is especially troublesome given that khat is legal and socially accepted in a large portion of the world, including Hassan's native Somalia, and that its effects are that of a relatively mild stimulant similar to caffeine.

Hassan's argument is an issue of first impression in our Circuit. The First, Sixth, and Eighth Circuits, however, have all rejected due process challenges to the khat-related regulatory scheme in the CSA. See Caseer, 399 F.3d at 835-39; United States v. Sheikh, 367 F.3d 756, 763-64 (8th Cir. 2004) (relying entirely on the First Circuit's reasoning in Hussein); Hussein, 351 F.3d at 14-16. Here, the district court, while noting the troubles associated with the vagueness of the CSA as it relates to khat, found that the statute was constitutional because the "scienter requirement mitigates any vagueness in the law." Because we find persuasive the reasoning of the district court below, and of the Sixth Circuit, we affirm the district court's determination that the statute is not unconstitutional under the vagueness doctrine.

The vagueness doctrine requires that, in order to be constitutional, a statute must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and "provide explicit standards for those who apply [it]." Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). However, the Supreme Court has also made clear that "[w]hen the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is

16

raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." Crowell v. Benson, 285 U.S. 22, 62 (1932); see also Chapman v. United States, 500 U.S. 453, 464 (1991) ("Every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." (internal citation and quotation marks omitted)). We are thus required to find a federal statute constitutional whenever possible.

We believe, as the district court found, that what saves the statute at issue here -- the CSA as it relates to khat -- from constitutional trouble is the fact that scienter is required for a conviction. See Caseer, 399 F.3d at 839; see also Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499 (1982) ("[T]he Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed."); Screws v. United States, 325 U.S. 91, 102-03 (1945) ("[W]here the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law. . . . [A] requirement of a specific intent . . . saves the Act from any charge of unconstitutionality on the grounds of vagueness."). Crimes arising out of the importation of controlled substances, and crimes for possession of controlled substances with intent to distribute -- such as Hassan was charged with and convicted of -- require proof that the defendant committed the offense "knowingly or intentionally." 21 U.S.C. §§ 841(a)(1) & 960(a)(1). As the Sixth Circuit explained in Caseer, "the concern that a person of ordinary intelligence could unwittingly expose himself or herself to criminal penalties due to the vagueness of the controlled substances schedules with respect to khat is overcome here

17

because . . . conviction requires a showing of actual knowledge that khat contains a controlled substance." 399 F.3d at 839. It is this requirement of proof of specific intent for the conviction at issue -- i.e. that the defendant "knowingly or intentionally" imported or possessed with intent to distribute khat with a controlled substance (indeed, as we will explain, as charged in this case, cathinone specifically) -- that persuades us that the statute governing khat is constitutional as applied to Hassan.

Nonetheless, while we believe the statute is constitutional, we are sympathetic to Hassan's argument because the statutory scheme, as it relates to khat, is troubling. Here, rather than including the words "khat"or "catha edulis" in the applicable regulations, the regulatory scheme references only khat's key chemical ingredients, cathine and cathinone. In contrast to the regulatory treatment of khat, Congress did list four botanical sources -- cannabis, coca, peyote, and poppy -- in the CSA in addition to their chemical ingredients.[5] We agree with Hassan, and the district court, that it would be helpful to people, who actually resort to statutes and regulations to determine whether their conduct is lawful, for Congress, through the statutory or regulatory scheme, to include the word "khat" in the CSA. However, we do not believe that Congress was required to do so. See Hussein, 351 F.3d at 15 ("Due process does not require the statute specifically to prohibit either 'khat' or 'khat containing cathinone' as a precondition to

_____

[5] We are aware that, similar to khat, "magic mushrooms" are not listed in the CSA while their psychedelic ingredients, psilocybin and psilocyn, are. Thus, we agree with the First Circuit that there is no reliable pattern here. Hussein, 351 F.3d at 16. Nonetheless, we also agree with Judge Holschuh that: (1) "two wrongs do not make a right;" and (2) "when dealing with the constitutional right to be fairly notified that to engage in certain conduct is a crime, [it is not] 'a stretch' to believe that persons of ordinary intelligence, seeing other plants specifically listed as being illegal but not the khat plant, could reasonably conclude that they can lawfully possess the khat plant." Caseer, 399 F.3d at 852 (Holschuh, J., concurring in part and dissenting in part).

18

conviction."); see also United States v. Powell, 423 U.S. 87, 94 (1974) ("The fact that Congress might, without difficulty, have chosen clearer and more precise language equally capable of achieving the end which it sought does not mean that the statute which it in fact drafted is unconstitutionally vague." (internal quotation and citation omitted)).

As the Sixth Circuit emphasized in Caseer, while the due process challenges raised in khat cases are unique, they nonetheless implicate serious constitutional concerns because "[w]hen a statute is precise on its face yet latently vague, the danger of persons being caught unaware of the criminality of their conduct is high." 399 F.3d at 836. Moreover, while ignorance of the law is no excuse, that principle "may be abrogated when a law is 'so technical or obscure that it threatens to ensnare individuals engaged in apparently innocent conduct.'" Id. at 837 (quoting United States v. Napier, 233 F.3d 394, 397-98 (6th Cir. 2000)). "Here, the term 'cathinone' is sufficiently obscure that persons of ordinary intelligence reading the controlled substances schedules probably would not discern that possession of khat containing cathinone and/or cathine constitutes possession of a controlled substance." Id. at 838.[6] Furthermore, mainstream dictionaries provide no help, as they do not define cathinone or mention it when they define khat. Id. (citing AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY, and the OXFORD ENGLISH DICTIONARY). Thus, while we agree with our sister circuits that the statute withstands constitutional scrutiny because of the scienter requirement, i.e., that the government was required to prove that

---

[6] Testimony that occurred at trial supports this position: The cooperator (Mohamed Hassan), a witness who had made his career in the khat trade, testified that he had never heard of "cathinone;" and the government's DEA chemist testified that he had never heard the term cathinone until trained by the DEA.

19

defendant <u>intended</u> to import or distribute khat <u>with a controlled substance</u>, we share the Sixth

Circuit's concern regarding criminal statutes that "rely on obscure technical or scientific terms

foreign to ordinary persons." <u>Id.</u>

**B. Sufficiency of the Evidence**

Because sufficiency of the evidence is a threshold issue that may obviate other challenges,

see <u>Allen</u>, 127 F.3d at 264, we next examine Hassan's contention that the evidence was

insufficient to support his convictions on the three khat-related conspiracy charges and the forty-

one substantive counts of money laundering.

*1. Standard of Review*

We review <u>de novo</u> challenges to the sufficiency of the evidence. <u>United States v.</u>

<u>Rangolan</u>, 464 F.3d 321, 324 (2d Cir. 2006). To succeed on such a challenge, Hassan must satisfy

a "heavy burden," <u>United States v. Santos</u>, 449 F.3d 93, 102 (2d Cir. 2006), as we consider "only

'whether the record evidence could reasonably support a finding of guilt beyond a reasonable

doubt,'" <u>United States v. Rodriguez</u>, 392 F.3d 539, 544 (2d Cir. 2004) (quoting <u>Jackson v.</u>

<u>Virginia</u>, 443 U.S. 307, 318 (1979)). We analyze the evidence in the light most favorable to the

prosecution, crediting "every inference that the jury may have drawn" in the government's favor.

<u>United States v. Finley</u>, 245 F.3d 199, 202 (2d Cir. 2001) (quoting <u>United States v. Gore</u>, 154

F.3d 34, 40 (2d Cir. 1998)). Moreover, "the government is entitled to prove its case solely

through circumstantial evidence, provided, of course, that the government still demonstrates each

element of the charged offense beyond a reasonable doubt." <u>Rodriguez</u>, 392 F.3d at 544. Thus,

we will uphold a conviction so long as "'<u>any</u> rational trier of fact could have found the essential

20

elements of the crime beyond a reasonable doubt.'" Id. (quoting Jackson, 443 U.S. at 319).

Nevertheless, Hassan's burden, while heavy, is "not an impossible one." United States v. Jones, 393 F.3d 107, 111 (2d Cir. 2004). "[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." United States v. Glenn, 312 F.3d 58, 70 (2d Cir. 2002) (internal quotation marks omitted). After all, "'it would not satisfy the Constitution to have a jury determine that the defendant is probably guilty.'" Rodriguez, 392 F.3d at 544 (quoting Sullivan v. Louisiana, 508 U.S. 275, 278 (1993) (alteration marks omitted).

### 2. The Evidence was Sufficient to Convict Hassan of the Khat Conspiracy Charge

"To sustain a conspiracy conviction, the government must present some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." Rodriguez, 391 F.3d at 545 (internal quotation marks omitted). The government need not show that any controlled substance was actually imported or distributed in order to convict a defendant of intentionally participating in the crime of conspiring to import or distribute a controlled substance. After all, "impossibility of success is not a defense." United States v. Jimenez Recio, 537 U.S. 270, 276 (2003) (internal quotation marks and citation omitted). The essence of the crime of conspiracy is "the agreement to commit the crime." Id. at 275.

As we noted earlier, khat may sometimes, but does not always, contain one or two stimulants that are controlled substances under U.S. law: cathinone and cathine. See 21 C.F.R. §§ 1308.11(f), 1308.14(e); see also 21 U.S.C. § 812. In this case, Hassan was convicted on two khat-

21

related conspiracy charges: conspiracy to import <u>cathinone</u>, in violation of 21 U.S.C. §§ 952(a), 963, and conspiracy to distribute and to possess with intent to distribute <u>cathinone</u>, in violation of 21 U.S.C. §§ 841(a), 846. The government's evidence at trial clearly established, and Hassan does not dispute, that Hassan knowingly conspired to import and distribute <u>khat</u>. Therefore, Hassan knew of and knowingly joined and participated in the scheme alleged. The only matter in dispute is whether the government presented evidence sufficient to demonstrate that Hassan "knowingly engaged in the conspiracy with the <u>specific intent</u> to commit the offenses that were the objects of the conspiracy." <u>United States v. Samaria</u>, 239 F.3d 228, 234 (2d Cir. 2001), <u>abrogated on other grounds by</u> <u>United States v. Huezo</u>, 546 F.3d 174, 180 n.2 (2d Cir. 2008) (emphasis added).

That is, because "[c]onspiracy is a specific intent crime . . . [p]roof that the defendant knew that <u>some</u> crime would be committed is not enough." <u>United States v. Morgan</u>, 385 F.3d 196, 206 (2d Cir. 2004) (internal quotation marks and citation omitted). A conspiracy conviction cannot be sustained unless the government established beyond a reasonable doubt that the defendant had the <u>specific intent</u> to violate the substantive statute. <u>United States v. DiTommaso</u>, 817 F.2d 201, 218 (2d Cir. 1987). Further, if direct evidence is absent, "[c]ircumstantial evidence of knowledge and specific intent sufficient to sustain a conviction must include some indicia of the specific elements of the underlying crime." <u>Samaria</u>, 239 F.3d at 235. Therefore, the government could not meet its burden by offering evidence sufficient to show that Hassan conspired to import or distribute <u>khat</u>; rather, the government had the burden of proving "beyond a reasonable doubt that [Hassan] actually knew that khat <u>contained a controlled substance</u>." <u>Caseer</u>, 399 F.3d at 841 (emphasis added).

22

As we previously explained, khat itself is not a controlled substance.  See Argaw, 395

F.3d at 527 ("Khat is not a controlled substance"); Hussein, 351 F.3d at 17 ("The government

concedes that it is not enough to show that the appellant knowingly possessed khat.").  Instead, it

is only "[w]hen khat contains cathinone, [that] khat is a Schedule I substance."  58 Fed. Reg. at

4317 (emphasis added).   Furthermore, the government concedes on appeal that it was required,

based on the indictment, to prove that Hassan knew he was dealing with khat containing

cathinone, or that substance by some other, or unknown, name.  We hold the government to this

concession.  Therefore, in this case, the government could not meet its burden by demonstrating

that Hassan knew he was dealing with khat containing cathine, the chemical ingredient regulated

by Schedule IV, but rather had to prove that Hassan knew he was dealing with khat containing

cathinone.  Cf. United States v. Morales, 577 F.2d 769, 776 (2d Cir. 1978) ("[T]he law is settled

that a defendant need not know the exact nature of a drug in his possession to violate § 841(a)(1);

it is sufficient that he be aware that he possesses some controlled substance.").  Nonetheless,

given that we must grant every inference that the jury may have drawn in favor of the government,

we find that the government -- barely -- met its burden of providing evidence sufficient to convict

Hassan.

What differentiates this case from the khat cases that other circuits have confronted is that

there was no direct evidence that any of the khat Hassan imported actually contained a controlled

substance – cathinone, in this case.  Cf. Caseer, 399 F.3d at 832; Hussein, 351 F.3d at 12.  While

the government seized the khat imported by Hassan on the day of his arrest, the government failed

to offer any evidence at trial regarding the chemical analysis of this package of khat.  Absent any

direct evidence of cathinone importation, the government relied on circumstantial evidence to

23

establish Hassan's intent.  See Samaria, 239 F.3d at 235.  Although the government has no obligation to establish that the conspiracy was successful, the government does bear the burden of proving, at a minimum, that there is evidence sufficient to prove beyond a reasonable doubt that Hassan "knew that he was dealing with a substance regulated by federal drug abuse laws," cathinone specifically, as charged by the indictment.  Hussein, 351 F.3d at 11; Caseer, 399 F.3d at 841 ("[T]o convict [defendant] properly of the charged offenses, the district court would need to have found beyond a reasonable doubt that [defendant] actually knew that khat contained a controlled substance.").[7]

Because of the lack of direct evidence, the government sought to prove the requisite intent in several ways.  First, the government presented testimony about Hassan's encounter with Agent Paul Kastava at JFK in 2001; second, it presented evidence about Hassan's presence at a bond hearing for Ahmed Mussa; and third, it presented evidence that Hassan tried to bring the khat into the country expeditiously.  While all of this evidence indicates that Hassan believed it was illegal to import khat into the United States, none of it, alone, supports what is required by law, i.e., "that the defendant knew he possessed [the] controlled substance [charged, cathinone], (even [if] he was either mistaken about or did not know its exact identity)."  Hussein, 351 F.3d at 19 (emphasis

---

[7] "This is not to suggest that in all Controlled Substances Act prosecutions the government must prove beyond a reasonable doubt that the defendant had actual knowledge that the substance at issue is controlled. For substances such as cocaine that are controlled per se under the controlled substances schedules and for which there are no due process fair-warning concerns, constructive knowledge inferred from the listing of the substance in the controlled substances schedules may suffice. However, when a targeted item, such as khat, is not itself listed in the controlled substances schedules, due process requires that the government prove beyond a reasonable doubt that the defendant had actual knowledge that the targeted item contained a controlled substance regulated under federal drug abuse laws."  Caseer, 399 F.3d at 842 n.8 (emphasis added).

added). Nevertheless, we are obligated to review all of the evidence collectively, not to review each piece of evidence alone. See United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000). It is with this understanding that we review the evidence presented by the government.

Although neither the government nor the district court lingered on this point, we begin by noting that Hassan's potential awareness, from his time living in Somalia, of the stimulant effect of khat was not enough to put him on notice that khat contained cathinone, or indeed some other controlled substance. Contra United States v. Sheikh, 367 F.3d 756, 763 (8th Cir. 2004). "Although actual knowledge that a substance is controlled might in some cases be inferred from the physical effects caused by the substance, in this case the stimulant effect of khat is too mild to permit a reasonable inference that [Hassan] knew that khat contained a controlled substance. . . . The seeming ubiquity of coffee houses in the United States attests to the fact that consuming products with stimulating effects is common custom in the United States, and the average American coffee drinker most likely does not pause to consider while drinking his or her morning 'cup of Joe' whether he or she may be subject to criminal sanction for possession of a controlled substance." Caseer, 399 F.3d at 843. Thus, general knowledge of the fact that khat contains ingredients that are stimulants is not sufficient to raise even an inference that Hassan knew that khat contained cathinone.

We now turn to the evidence that the government argues supports the jury's finding that Hassan was guilty of conspiring to import and distribute cathinone. First, Hassan was present at a bond hearing for a fellow khat importer, Ahmed Mussa. At that hearing, importation of khat was referred to at least twice as importation of a "drug" and it was compared to marijuana for the purposes of sentencing. Hassan participated in part of the hearing, being asked to come to the

25

front of the room to testify. A jury could reasonably conclude that he was present in the room when khat, drugs, and marijuana were referenced. This is close to sufficient circumstantial evidence from which a jury could rationally conclude that Hassan knew that khat contained a controlled substance.

Second, the government argues that the speed with which Hassan attempted to bring the khat into the United States and the fact that he hired people to help him get khat out of Customs quickly -- using Fuller's fraudulent stamps to secure quick release of the packages and employing overnight delivery services -- indicate that he knew he was importing the controlled substance cathinone. This evidence could have been construed in light of testimony that, over time, cathinone degrades into weaker chemicals. Transport speed is therefore directly related to cathinone's potency, and the faster khat is shipped, the greater the probability that it will contain cathinone when it arrives at its intended destination. Combined with proof that Hassan spent between $3,000 and $4,500 a week to ensure that the khat was imported with sufficient speed, the jury was free to infer that Hassan intended to deal not merely in khat, but khat with cathinone, specifically. The impact of this cumulative evidence is weakened, however, because there is nothing in the record with respect to how much time it actually took to ship the khat to the United States, i.e., how much time had elapsed between the moment the khat was picked in Northeast Africa and the time it arrived in the United States. Nevertheless, it does aid the government's case. Further, because Hassan's importation methods included efforts to conceal the nature of his packages, the shipping evidence adds to Hassan's presence at the bond hearing to help show that Hassan knew cathinone to be a regulated substance.

Finally, the government introduced evidence that Hassan knew khat could be seized at

26

Customs. Of course, "[n]ot all items that may be seized by the U.S. Customs Services, however, are classified as controlled substances . . . ." Caseer, 399 F.3d at 844 (internal quotation marks and citation omitted). Thus, while a jury could infer from Agent Kastava's testimony that Hassan "knew importation of khat violated U.S. customs laws," it does not, alone, support the inference that Hassan "knew he would be violating U.S. drug laws by importing" cathinone. Id. But it does add something to what a jury could infer from Hassan's presence at Mussa's bond hearing and from his attempted speed in bringing khat to the United States.[8]

All this should make clear that we have deeply serious concerns regarding the sufficiency of the evidence in this case. We nevertheless find that the evidence -- when viewed collectively -- permits a finding of guilt. See Autuori, 212 F.3d at 114 (asserting that we must "consider the evidence in its totality, not in isolation"); United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999). This is because of our exceedingly deferential standard of review: we must analyze the evidence in the light most favorable to the prosecution, again crediting "every inference that the

_____

[8] The government also proffered "evidence" that we do not believe supports its case that Hassan was guilty of conspiring to import and distribute a Schedule I drug. The government presented evidence that it tested several packages of khat that were obtained after Hassan's arrest, and the DEA chemist testified that these packages contained both cathinone and cathine. Assuming arguendo both that the chemist's testimony was admissible as relevant, and that DEA forms recording the three additional seized packages were admissible hearsay -- two assumptions about which we have grave doubts -- this additional evidence does not help show even that Hassan intended to import khat, nor does it support an inference that the seized packages were connected to the charged conspiracy. The government provided no evidence, for instance, about how these packages were addressed and labeled, from where they were mailed, how long they were in transit, or any other information that would have provided stronger circumstantial proof that these packages were connected to Hassan

And while Agent Kastava testified that he told Hassan that khat was illegal in the United States -- a statement which is in fact inaccurate, as khat is only illegal when it contains a controlled substance -- he did not testify that he told Hassan it was illegal because it could contain controlled substances, or more importantly, for the purposes of this case, cathinone. As such, this evidence has little use.

jury may have drawn" in the government's favor. Finley, 245 F.3d at 202. We believe that when the evidence is viewed collectively -- especially Hassan's presence at Mussa's bond hearing, his efforts to avoid detection by law enforcement, and his manifest desire to speed the transit of khat into the United States -- there is sufficient circumstantial evidence from which a jury could have inferred the requisite scienter, i.e., that Hassan knowingly intended to import and possess with intent to distribute khat containing cathinone.

### 3. The Evidence was not, However, Sufficient to Convict Hassan of the Substantive Money Laundering Charges

Hassan was also charged with forty-one substantive counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1), based on money orders he purchased between December 21, 1998, and May 15, 2000. To sustain the substantive money laundering charges, the government must establish that Hassan (1) knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, (2) conducted or attempted to conduct a financial transaction, (3) which in fact involved the proceeds of specified unlawful activity, (4) either with (a) the intent to promote the carrying on of specified unlawful activity or (b) the knowledge that the transaction was designed at least in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity. See 18 U.S.C. § 1956(a); United States v. Gotti, 459 F.3d 296, 334 (2d Cir. 2006). The specified unlawful activity charged was "narcotics trafficking," in violation of 21 U.S.C. §§ 841(a)(1), 846, and 963.

The third requirement is dispositive in this case. To sustain the substantive money laundering charges, in stark contrast to the conspiracy charges, the government must show not

28

simply that Hassan laundered money that he believed to be the proceeds of cathinone sales, but that the funds he laundered were in fact the proceeds of cathinone sales. As the government conceded at oral argument, "[w]e don't have any seizures from that time period, so there's no direct evidence" to show that the underlying transactions actually involved the proceeds of cathinone trafficking. Moreover, there is no circumstantial evidence to show that Hassan actually trafficked in cathinone during this period. Instead, the government relies on the abundant evidence of Hassan's khat-related activities. For instance, the government argues that the money laundering charges are supported by the notebooks and date books Hassan kept detailing his khat transactions. In addition, the government contends that the fact that Hassan's declared income was an amount far less than the value of the money orders he purchased supports an inference that he used the proceeds of unreported khat sales to purchase the money orders. However, none of this evidence speaks to whether Hassan actually imported cathinone during this time period. Because cathinone can disappear from khat in a matter of days, and must be imported from the Horn of Africa or the Arabian Peninsula, the mere presence of khat in the United States certainly does not support an inference that cathinone is present. See United States v. Muse, No. 06-cr-600, 2007 WL 391563, at *4 (S.D.N.Y. Jan. 30, 2007); Argaw, 395 F.3d at 526 ("[W]ithout scientific testing on a case-by-case basis, it cannot be determined when cathine or cathinone appears in khat."). The circumstantial evidence that the government presented does not, in any way, support an inference that Hassan's proceeds were the result of the specified illegal activity, i.e., the importation of cathinone. Thus, the substantive money laundering charges cannot be sustained. We therefore reverse the judgment of the district court, and the case is remanded with instructions to enter a judgment of acquittal on all forty-one substantive counts of money laundering, in

29

violation of 18 U.S.C. § 1956(a)(1).

### 4. The Evidence was Sufficient to Convict Hassan of Conspiring to Launder Money.

Hassan was also charged with one count of conspiracy to launder money, in violation of 18 U.S.C. § 1956(h). "In order to establish that a defendant conspired to launder monetary instruments in violation of 18 U.S.C. § 1956(h), the government must show that the defendant agreed to: 1) conduct a financial transaction; 2) involving the proceeds of specified unlawful activity; 3) knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity; and 4) knowing that the financial transaction was designed in whole or in part to conceal or disguise the nature, source, location, ownership, or control of those proceeds." United States v. Henry, 325 F.3d 93, 103 (2d Cir. 2003).

The evidence presented at trial was sufficient to sustain a conviction on this count, which charged Hassan with conspiring to launder money "between December 1998 and April 2003." [A 36] The money orders, unreported income, date books, and notebooks allowed the jury to infer that Hassan agreed to conduct various financial transactions, knowing that the transactions were structured to disguise the nature and source of the funds involved. Having found the evidence sufficient to convict Hassan of the cathinone conspiracy charges, the jury could have easily inferred that Hassan believed that the funds related to cathinone trafficking. Because the government presented money orders purchased by Hassan in November 2002, after his participation in the bond hearing and following his encounter with Agent Kastava, the jury was able to also conclude that Hassan knew cathinone was a regulated substance during the period charged in the indictment. However, as we explain below, we believe there was a fundamental and prejudicial error in the district court's instructions to the jury on scienter. Because we fear

30

that this error may have affected the jury's determination on this issue, we vacate the judgment of the district court, and remand for a retrial on the one count of conspiracy to launder money, in violation of 18 U.S.C. § 1956(h). For the same reasons, discussed in further detail below, we also vacate the judgments on the one count of conspiracy to import cathinone, in violation of 21 U.S.C. §§ 952(a), 963, and the one count of conspiracy to distribute and to possess with intent to distribute cathinone, in violation of 21 U.S.C. §§ 841(a), 846.

## C. Erroneous Jury Instructions

### 1. Standard of Review

We review de novo a claim of error in jury instructions, "reversing only where, viewing the charge as a whole, there was a prejudicial error." United States v. Aina-Marshall, 336 F.3d 167, 170 (2d Cir. 2003). However, the government contends that here de novo review is not appropriate. Rather, the government asserts that a plain error standard applies, because Hassan failed to present his challenge to the charge on intent to the district court. See, e.g., United States v. Miller, 116 F.3d 641, 672 (2d Cir. 1997). We disagree, and instead find that de novo review is appropriate.

The government's claim sweeps too broadly. At the charging conference, defense counsel clearly raised an objection to the jury instructions that dealt with precisely the issues now before us. With respect to Count One, importation, defense counsel stated:

> The only controlled substance involved in this case is cathinone. If it's not cathinone, we've stipulated cathine could not be regarded, khat is not a controlled substance. I don't know--they can't argue heroin or cocaine. There is no evidence of anything other than cathinone. This . . . broadens it so wide. . . . I just think the sentence should be deleted.

31

> . . . The officer sat on the stand, testified that khat was a controlled substance.
> . . . The chemist witness went further, he even said cathine, I found cathine, and
> it's on schedule four. . . . What if the jury heard that and they say oh that cathine
> business, it might have been cathine.

Hassan's trial counsel thus made clear that he believed that portions of the jury charge should be stricken so as to assure that the jury did not convict Hassan, improperly, on the basis of his conspiring to import "some controlled substance" other than cathinone. Although Hassan did not explicitly reiterate his objection to the jury instruction relating to Count II, the same charging language was at issue in both drug counts. There was no reason for Hassan to limit his challenge to Count I, nor for the court to believe he was doing so. It is true that, as the government argues, if Hassan had specifically objected to the charge for Count II, the court may have made the same modifications to the scienter instruction as it did for Count I. However, that is immaterial on this appeal, because Hassan is arguing that -- even as modified -- the charge for Count I was erroneous.

The government also claims that the arguments being raised on appeal are not preserved because trial counsel, after objecting to the jury instructions, failed to propose alternative language. This argument also fails. Rule 30(d) requires only that a party "inform the court of the specific objection," Fed. R. Crim. P. 30(d), and does not require that a party propose alternate language in order to preserve a challenge for appeal. As the cited portion of counsel's statements indicates, the substance of the claim now being raised on appeal was squarely raised below: counsel made it clear to the trial court that he objected to the charge because he believed it permitted the jury to convict Hassan based on a finding that Hassan intended to import and distribute khat or khat containing cathine. Cf. United States v. Masotto, 73 F.3d 1233, 1237-38

(2d Cir. 1996) (concluding that specific objection was preserved so long as counsel's arguments were "sufficient to direct the district court to his contention," even if counsel failed to mention the specific language he was requesting); see also 2A Charles A. Wright et al., Federal Practice & Procedure § 484 (3d ed. 2000) ("A party may object to an instruction given by the court although it has not requested an instruction of its own on the point."); United States v. English, 409 F.2d 200, 201 (3d Cir. 1969) ("[W]e note that counsel's exception to the charge, although no requests for charge were submitted, was sufficient to preserve the error for assignment on appeal."). Thus, we review de novo Hassan's claim that there was prejudicial error in the jury instructions.

### 2. The District Court Made a Fundamental Error in its Jury Instructions

"A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." Anderson v. Branen, 17 F.3d 552, 556 (2d Cir. 1994). Therefore, "[a]n erroneous instruction, unless harmless, requires a new trial." Id. "An error is harmless only if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." United States v. Quattrone, 441 F.3d 153, 177 (2d Cir. 2006) (quoting United States v. Carr, 424 F.3d 213, 218 (2d Cir. 2005) (internal quotation marks omitted)).

We begin by noting that, in this case, the instruction to the jury on the requirement of intent is critical for two reasons. First, as noted above, scienter is what preserves the relevant statutory and regulatory scheme from a successful due process challenge. Second, Hassan has been charged only with conspiracy, and thus the government does not need to prove that Hassan ever actually imported or possessed cathinone with intent to distribute, but only that he intended to do so. See United States v. Morgan, 385 F.3d 196, 206 (2d Cir. 2004) ("Conspiracy is a

33

specific intent crime . . . ."); United States v. Soto, 716 F.2d 989, 993 (2d Cir. 1983) (stating that the government must "establish[] beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute[s]" charged as the object of the conspiracy (citation omitted)). In a conspiracy case, "[p]roof that the defendant knew that some crime would be committed is not enough." Morgan, 385 F.3d at 206 (citation omitted).

Count One charged Hassan with conspiring to import cathinone, a Schedule I controlled substance, in violation of 21 U.S.C. §§ 952(a), 963. As to Count One, the district court instructed the jury that in order to convict Hassan, the jury "must find that the defendant knew it was a controlled substance he was conspiring to bring into the United States," and explained that the jury "need not find that the defendant knew or believed that it was a drug called cathinone, as long as the government proves that he knew and intended that some controlled substance would be imported into the United States." Count Two charged Hassan with conspiring to possess with intent to distribute cathinone in violation of 21 U.S.C. §§ 841(a)(1), 846. As to Count Two, the district court instructed the jury that, in order to convict Hassan, the jury had to find that Hassan "acted with the specific intent of possessing the controlled substance," and explained that "[t]he government need not, however, prove that the defendant knew the exact nature of the controlled substance in his possession. It is enough that the government proves that the defendant knew that he possessed some kind of a controlled substance."

Hassan argues that the charges to the jury on the conspiracies to import and distribute cathinone were erroneous and not accurate explanations of the law, because they left open the possibility that the jury could convict Hassan on an improper basis -- either on the basis that he intended to import and distribute khat (which is not a controlled substance) or on the basis that he

34

imported or distributed cathine (which, as the government has acknowledged, was not the controlled substance which Hassan was charged with possessing in the indictment). Hassan points out that the district court did not explain to the jury that khat itself is not a controlled substance, or that defendant's intent to import or possess khat could not be the basis for his conviction without proof that he intended to import or possess khat with cathinone. Furthermore, the district court did not explain to the jury that cathine is a different, and less serious controlled substance, and could not be the basis for Hassan's conviction of the crimes charged in the indictment.

Hassan contends that the problems with the jury instructions are of particular import, because at trial, government witnesses repeatedly suggested -- incorrectly, and without correction by the court -- that khat itself is a controlled substance. Because khat is not, per se, a controlled substance, the district court ruled before trial that the "[g]overnment would not be permitted to introduce evidence that khat is per se a controlled substance." Nonetheless, at trial numerous government witnesses suggested that khat was in fact a controlled substance. For example, Special Agent Kastava testified that khat is "an illegal substance in the United States," Special Agent Lee testified that khat is a "narcotic" and "is on the controlled substance list," Special Agent Villanucci testified that he arrested Hassan for "[i]mportation of khat" and arrested another individual earlier for "attempting to import khat," Fuller testified that he pled guilty to "[c]onspiracy to import khat," and that khat is "a controlled substance," and Mohamed Hassan testified that he pled guilty to importing "forbidden stuff . . . [t]he khat."[9] Furthermore, a

_____

[9] Defense counsel actually highlighted some of this testimony when objecting to the jury instructions, but the judge indicated that a law enforcement officer's testimony that khat was a controlled substance was a matter "for the jury." We are troubled by this comment; regardless of

government witness also discussed the illegality of khat with cathine.  Specifically, the DEA chemist testified that khat may contain cathine, that cathine is a Schedule IV controlled substance, and that the khat tested in connection with this case in fact contained both cathine and cathinone.  Despite this repeated testimony, the district court did not clarify to the jury that Hassan was charged with importing or possessing khat with cathinone, not khat, nor khat with cathine.  Thus, Hassan argues that these statements by witnesses, combined with the jury instructions, allowed the jury to believe that it could convict Hassan because he intended to import and possess khat, or intended to import and possess khat with cathine.

The government makes a number of arguments concerning the evidence in this case.  First, the government argues that Hassan misreads the jury instructions, taking one sentence out of context, and that a review of the entire charge shows that Hassan's argument has no merit.  While the government concedes that witnesses testified that khat is an unlawful controlled substance, it nonetheless dismisses this testimony as "not literally false" given the fact that khat is a controlled substance when it contains either cathinone or cathine, like the khat at issue.  But cf. Argaw, 395 F.3d at 527 ("[k]hat is not a controlled substance"); Hussein, 351 F.3d at 17 ("But khat, unlike cocaine, is not a controlled substance per se, and the government concedes that it is not enough to show that the appellant knowingly possessed khat."); 58 Fed. Reg. at 4317 ("When khat contains cathinone, khat is a Schedule I substance;" and "[w]hen khat does not contain cathinone, but does contain cathine, khat is a Schedule IV substance.").  The government also claims that the DEA chemist corrected any such misconception by testifying "unequivocally" that khat was not on the

how the legal status of khat is characterized, it is a legal issue for the judge to decide, and clarify for the jury, not a question of fact reserved for the jury.

36

controlled substances list. We disagree with the government's characterization of this testimony; to the contrary, we believe that Hall's testimony was clearly equivocal. When asked whether khat, the plant, was on the controlled substance list, he replied, "No, it's not. Not that I know of." Moreover, the jury was still free to weigh Hall's testimony against the misleading testimony of the other government witnesses, including law enforcement officers, and could have reasonably reached the conclusion that khat was, in fact, a controlled substance.

But the question before us is not, as the government suggests, whether this trial testimony was literally false, but rather whether, in light of the testimony, the judge's instructions failed to present the jury with a correct explanation of the law. The government argues that Hassan takes a single sentence in the jury instructions out of context and that the charge as a whole properly instructed the jury that an element of each charged crime was the intent to import or possess the controlled substance cathinone, regardless of whether Hassan knew the substance by name. The government is correct that references to cathinone appear frequently in the jury instructions:

> [Reading from the indictment:] "Count One: Conspiracy to Import Cathinone. . . . [defendant] did knowingly and intentionally conspire to import into the United States . . . a substance containing cathinone.
> "I instruct you that cathinone is a controlled substance under the law and for the purposes of these statutes."
> "Before you may convict the defendant of conspiracy to import cathinone as charged in the indictment, the government must establish each of the following elements beyond a reasonable doubt."
> "[Y]ou need not find that the defendant knew or believed that it was a drug called cathinone, as long as the government proves that he knew and intended that some controlled substance would be imported into the United States. As I told you earlier, cathinone is a controlled substance."
> [From the indictment:] "Count Two: Conspiracy to Possess with Intent to Distribute Cathinone. . . . [defendant] did knowingly and intentionally conspire to distribute and possess with intent to distribute a controlled substance, which offense involved a substance containing cathinone . . . ."
> "I have already instructed you that cathinone is a controlled substance under the

law."

"[Y]our decision as to whether the defendant conspired to commit a particular unlawful act, either distribution of cathinone or possession with intent to distribute cathinone, must be unanimous."

"The elements of possession with intent to distribute are: First, that the defendant possessed cathinone; Second, that the defendant knew that he possessed a controlled substance; and Third, that the defendant possessed cathinone with intent to distribute it."

"The elements of the crime of distribution of cathinone are: First, that the defendant distributed cathinone; Second, that the defendant distributed the cathinone knowingly."

Moreover, cathinone is the only controlled substance identified in the jury instructions.

The government therefore argues that the purpose and the effect of the jury instruction was to inform the jury that Hassan need not know that the controlled substance at issue was named cathinone, so long as Hassan realized it was a controlled substance. While we agree that this was likely the district court's purpose in stating the jury instructions as it did, we disagree with the government as to the effect that the instructions may have had. We emphasize, again, that in this case the scienter requirement is what prevents the entire regulatory scheme, as it relates to khat, from being unconstitutional. Therefore, we must scrutinize the instructions regarding scienter, and the context in which they were given, very closely. Here, we believe that the jury instructions failed to correctly inform the jury that a bare intent to import or possess khat, or khat with cathine, would not be sufficient to sustain Hassan's conviction. Instead, in light of the evidence presented to the jury throughout the trial, the jury may have very well convicted Hassan on the erroneous belief that khat is a controlled substance, or on the basis of a belief that Hassan must have known, at a minimum, that he was importing with intent to distribute cathine. We therefore find that there was a fundamental error in the jury instructions. Furthermore, given how close we believe the sufficiency of the evidence was in this case, and the essential role that the scienter requirement

38

played in our due process analysis, this error was not harmless.

We are also unpersuaded by the government's remaining arguments. First, the government argues that the charge as a whole was adequate because cathinone was the only substance identified as a controlled substance in the jury charge. While this is so, as we explained above in detail, the jury also heard inaccurate testimony to the effect that khat is illegal, along with accurate testimony that cathine is also illegal. The district court's jury instruction thus left open the possibility that the jury would convict on one of these alternative bases. Second, the government argues that it is inconceivable that Hassan intended to import anything other than cathinone in light of his overnight delivery methods. This is obviously not true. Hassan's customers may have preferred fresh khat containing cathine, or simply fresh khat containing no controlled substances. Despite the expedited means of delivery, there was absolutely no evidence in the record of when the khat arrived, much less that it arrived in the United States within 48-72 hours of it being cut. See U.S. Drug Enforcement Administration, Fact Sheet, Khat, AKA: Catha Edulis, http://www.dea.gov/pubs/pressrel/pr072606a.html (last visited Aug. 10, 2008)(stating that "[c]athinone . . . dissipates within 48 hours of harvest"); FDA Report 11-12 (stating that khat leaves have been reported to lose their effect within three days of harvesting).

Finally, and perhaps most troubling, the government cites our decision in United States v. Morales, 577 F.2d 769, 776 (2d Cir. 1978), to argue that Hassan could have been lawfully convicted by the jury even if the jury found that he intended to import an illegal substance with cathine, and not an illegal substance with cathinone. First, as stated previously, we believe the jury instructions, in light of testimony at trial, created a real possibility that the jury may have convicted Hassan on the erroneous belief that khat, itself, was a controlled substance, and

39

therefore this argument is unpersuasive. Second, the government conceded at trial that it was not trying an "any" controlled substance charge, but rather, was limiting itself to trying a cathinone-related charge, as listed in the indictment. Moreover, the government's attempt to use Morales to argue that any error in the jury instructions was harmless runs squarely into Hassan's constructive amendment claim. A conviction based on cathine, rather than cathinone, would have been an impermissible constructive amendment of the indictment. See United States v. Wozniak, 126 F.3d 105 (2d Cir. 1997) (holding that an instruction permitting the jury to convict on the basis of marijuana transactions, when indictment alleged only cocaine and methamphetamine transactions, was an impermissible constructive amendment of the indictment). Under Morales, the government could have charged this case as one involving either cathinone or cathine, or both. However, the government made the deliberate choice to indict Hassan with conspiring to import and possess cathinone; we assume, because it wanted to invoke the harsh penalties applicable to a Schedule I controlled substance.

By making this charging decision, Hassan's alleged intent to import and possess this Schedule I substance was critical to a conviction. See Wozniak, 126 F.3d at 109. "[A] defendant has the right to be tried only on charges contained in an indictment returned by a grand jury. An unconstitutional amendment of the indictment occurs when the charging terms are altered, either literally or constructively." Id. (internal quotation marks and citation omitted). Constructive amendments are "per se violation[s] of the Grand Jury Clause of the Fifth Amendment that require[] reversal even without a showing of prejudice to the defendant." Id. (internal quotation marks and citation omitted). Hassan's intent was an essential element of the offense, and an impermissible constructive amendment of the indictment occurs if the impermissible alteration

40

"affect[s] an essential element of the offense." United States v. Patino, 962 F.2d 263, 266 (2d Cir. 1992). The jury charge, which completely failed to explain the unique regulatory scheme, and allowed the jury to convict if Hassan conspired to import or distribute "some controlled substance," simply does not satisfy the burden assumed by the government in this case. Therefore, we vacate the judgment, and remand for a new trial.

We understand that the khat-related regulatory scheme poses unique and complicated issues for the government, defendants, and district courts. We are not unsympathetic to those problems. In this case, however, given the terms of the indictment, the misleading evidence allowed at trial concerning the illegality of khat, and the potentially confusing evidence concerning cathine, the jury instructions were clearly erroneous. Furthermore, the jury instructions were not harmless. Under the circumstances of this case, to be valid, the jury charge needed to explain explicitly to the jury that (1) khat itself is not a controlled substance and Hassan cannot be convicted simply for intending to import or possess with intent to distribute khat; (2) if the jury found that Hassan had the intent to import and possess khat with cathine, that too would not be sufficient to convict Hassan; and (3) that the government is bound by the scienter burden it assumes in the crimes it charges -- the government was required to prove here that Hassan had the intent to import and possess khat with cathinone.

## D. Remaining Claims

We are reversing and ordering an entry of acquittal on forty-one of Hassan's substantive money laundering charges, and vacating and remanding to the district court for retrial on all remaining charges. Therefore, we need not consider Hassan's remaining arguments that he was

41

denied a fair trial because the government failed to correct false and misleading testimony, his trial counsel was ineffective, the district court erred in admitting the DEA chemist's testimony and the exhibits regarding the testing of three samples of khat, and that his sentence was erroneous and unreasonable.

### III. CONCLUSION

Because we conclude that the evidence was insufficient to convict Hassan of the forty-one substantive counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1), we REVERSE the judgment on these counts, and direct the district court to enter an order of acquittal. Because we believe there was a fundamental error in the jury instructions that was not harmless, we VACATE Hassan's conviction on the remaining counts and remand to the district court for retrial, if the government should wish to pursue the matter.