12-1221-cr
United States of America v. Clark

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2012

Argued: June 25, 2013          Decided: January 17, 2014

Docket No. 12-1221-cr

- - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,
    Appellee,

        v.

JEREMIAH K. CLARK,
    Defendant-Appellant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

Before: NEWMAN, WINTER, and DRONEY, Circuit Judges.

Appeal from the March 7, 2012, judgment of the United States District Court for the Western District of New York (William M. Skretny, District Judge), convicting Appellant, after a jury trial, of being a felon in possession of a firearm (Count I) and possession of a controlled substance (Count II).

Affirmed as to Count I; reversed as to Count II.  Judge Droney dissents from the reversal as to Count II with a separate opinion.

> Stephan J. Baczynski, United States Attorney's Office, Buffalo, N.Y. (William J. Hochul, Jr., United States Attorney's Office, Buffalo, N.Y., on the brief), for Appellee.

Nicholas J. Pinto, Nicholas J. Pinto, Attorney at Law, New York, N.Y., for Defendant-Appellant.

JON O. NEWMAN, Circuit Judge:

This appeal of a criminal conviction presents extraordinary facts that challenge a reviewing court to take seriously its constitutional obligation to assure that evidence resulting in a conviction was sufficient to permit a jury reasonably to find guilt beyond a reasonable doubt. Jeremiah K. Clark appeals from the March 7, 2012, judgment of the District Court for the Northern District of New York (William M. Skretny, District Judge), convicting him, after a jury trial, of being a felon in possession of a firearm (Count I) and possession of a controlled substance (Count II). We have affirmed the conviction on Count I in a Summary Order filed today. In this opinion, we reverse the conviction on Count II.

## Background

On Nov. 16, 2002, officers from the City of Lockport Police Department (Lockport, N.Y.) and the Niagara County Sheriff's Office (Lockport, N.Y.), responded to a 911 call reporting that a group of men, possibly armed, had just left Gonzo's Bar in

Lockport in a white Jeep Cherokee after trying to "jump somebody." When the officers arrived at the bar, they saw Clark and three others sitting in the Cherokee. The facts of the ensuing confrontation, detailed in a Summary Order filed today, are not relevant to the issue decided in this opinion, except to note that the police found a firearm in the Cherokee and arrested Clark. In this opinion, we are concerned only with the facts occurring after Clark's arrest.

Niagara County Deputy Sheriff Anthony Giamberdino placed Clark, alone, in the rear compartment of his police cruiser. Clark was handcuffed with his hands behind his back. Niagara County Deputy Sheriff Gary May testified that the link between the two bracelets of the handcuffs was no longer than one or one and one-half inches. City of Lockport Police Officer Steven Abbott testified that before Clark was placed in the car, he patted down his waist, pockets, pant legs, and coat, looking for weapons. Nothing was found. The ride from the scene of the arrest to the Lockport police station lasted about one minute. After arriving at the police station, May helped Clark, still handcuffed, out of the car. Clark was then escorted into the booking area of the police station.

Once Clark was out of the police car, Giamberdino lifted the cushion of the back seat out and up, making visible the space between the back of the back-seat cushion and the bottom of the back-seat back rest. In that space he saw a quantity of a white powdery substance that later analysis determined was crack cocaine. Giamberdino also testified that he had checked this space before starting his evening shift, nothing was there at that time, and Clark was the first person to occupy the back seat of the car that evening.

Deputy Sheriff May testified that as Clark got out of the car and walked past him, he did not see any white powdery substance on his hands, pants, or jacket. Nor did he see any white powdery substance on the back seat until the seat was lifted up. No glassine envelope or other container was found in the police car or on Clark's person.[1]

_____

[1] Giamberdino testified that he saw a lighter on the back seat. Although the Government's brief says that Giamberdino "observed a white powdery substance on the back seat," Brief for United States at 3 (emphasis added), the cited pages, Tr. 446-47, contain no such statement. On cross-examination, Giamberdino testified, "Deputy May saw a lighter on the seat, and I went to grab it, and then I just did my check right there, and that's when I noticed the white powdery substance." Moreover, there is no testimony that any officer saw traces of cocaine on the lighter or looked at the insides of Clark's pockets to see if there were traces of cocaine there, a logical thing to do if they thought Clark had brought the cocaine into the car.

Discussion

We fully understand the standards for appellate review of a jury's finding of guilt. We are to view the evidence "in the light most favorable to the prosecution," Jackson v. Virginia, 443 U.S. 307, 319 (1979), and determine "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt," id. at 318 (footnote omitted). A defendant challenging the sufficiency of the evidence "bears a heavy burden." United States v. Hassan, 578 F.3d 108, 126 (2d Cir. 2008). All reasonable inferences are to be drawn in the prosecution's favor, and we are to defer to the jury's assessment of the witness's credibility. See United States v. Sabhnani, 599 F.3d 215, 241 (2d Cir. 2010). The deference to the jury's verdict required by these standards does not mean, however, that we must never deem evidence insufficient. Nor does it mean that if there is any evidence arguably in support of a verdict, we must affirm.[2] Of course, the issue is not whether we believe the evidence does not prove guilt beyond a reasonable doubt. See

_____

[2] A conviction in the absence of any evidence to support a jury's guilty verdict violates the Due Process Clause, see Thompson v. City of Louisville, 362 U.S. 199, 206 (1960), whereas the existence of evidence of insufficient probative force to permit a jury reasonably to find guilt beyond a reasonable doubt violates the reasonable doubt standard constitutionalized by In re Winship, 397 U.S. 358, 363-64 (1970).

<u>Jackson</u>, 443 U.S. at 318-19.  But if we are to be faithful to the constitutional requirement that no person may be convicted unless the Government has proven guilt beyond a reasonable doubt, we must take seriously our obligation to assess the record to determine, as <u>Jackson</u> instructs, whether a jury could <u>reasonably</u> find guilt beyond a reasonable doubt.

In our view, this record does not permit an affirmance on Count 2.  Several facts are not in dispute: (1) Clark was patted down for weapons before being placed in a police car;  (2) no object large enough to contain a substantial quantity of crack cocaine was noticed;  (3) Clark was then placed in the back of a police car with his hands handcuffed securely behind his back; (4) the ride to the police station took about one minute; (5) shortly after Clark got out of the vehicle, with his hands still handcuffed behind his back, a police officer lifted the back seat cushion sufficiently to disclose the space between the back edge of the back-seat cushion and the lower edge of the back-seat back rest;  (6) in that space the officer found a quantity of crack cocaine measuring more than five inches in length and about one inch wide, and of sufficient depth such that some quantities of crumbled crack cocaine are visible above the layer of fully powdered crack cocaine (a photograph of the crack cocaine appears

-6-

in the Appendix to this opinion); (7) no traces of crack cocaine were observed on Clark's clothing or on his hands; (8) no glassine envelope or similar container customarily used for holding a quantity of crack cocaine was found in the police car, nor was Clark observed to have discarded such a container after leaving the police car.[3]

There are only three possible ways that this quantity of crack cocaine could have been secreted in the space in which it was discovered. (1) Clark might have removed the quantity from his person or clothing and wedged it into the space underneath the seam where the back-seat cushion meets the back-seat back rest; (2) someone other than Clark might have inadvertently left

---

[3] One additional item of evidence is arguably relevant. Lt. Michael Costello testified that at the police station Clark said, "I'll confess to everything if you let my cousins go." However, there is no testimony that Clark saw the cocaine after Giamberdino lifted up the seat cushion or otherwise became aware that it had been discovered. After he got out of the police car, Clark was escorted to the booking area of the Lockport police station. Both May and Costello testified that Clark was in the booking area of the Lockport police station when Giamberdino discovered the cocaine. Thus, there is no basis to believe that Clark's offer to confess (accepting that he did say it) applied to any offense conduct other than the disturbance at the bar that had given rise to the 911 call and his possession of a weapon. Even if the jury inferred that Clark's offer to confess to "everything" covered the cocaine, that inference would not be reasonable since it would have been undermined by the virtual impossibility of Clark's having secreted the cocaine behind the seat cushion while handcuffed and without leaving a trace on his clothing or person.

the crack cocaine in that space before Clark entered the police car; (3) someone other than Clark might have deliberately placed the crack cocaine in that space after Clark got out of the police car. Clark's conviction for possessing crack cocaine is valid only if a jury could reasonably find the first possibility beyond a reasonable doubt.

We cannot say it is an absolute impossibility for a person with his hands securely handcuffed behind his back to extract a substantial quantity of crack cocaine from his person or clothing and wedge it into the space where the quantity was found without leaving a trace of cocaine on his fingers or clothing, but we can say that the possibility of such an occurrence is so exceedingly remote that no jury could <u>reasonably</u> find <u>beyond a reasonable doubt</u> that it happened. The remote possibility is diminished virtually to zero by the fact that no glassine envelope or other packaging material was found in the police vehicle or on Clark's person. It taxes credulity to think that Clark carried such a quantity of crack cocaine loose in his pocket and, while handcuffed, extracted it from his pocket and secreted it where it was found, all without leaving a trace on his person or clothing.

Whether or not the extraordinary improbability of circumstances necessary for conviction on Count II in fact occurred, it is better to honor the constitutional standard of proof beyond a reasonable doubt by appropriate appellate review than to require Clark to serve three extra years, in addition to the ten years for Count I, for an offense of which he is highly likely to be innocent.

It has been said that it is better to let ten guilty persons go free than to convict one innocent person.[4] In the past, some have favored higher ratios.[5] However one prefers to quantify an unacceptable risk of convicting the innocent, it is difficult to imagine a case where the possibility that an innocent person has been convicted of an offense is greater than the one now before us.

---

[4] See Furman v. Georgia, 408 U.S. 238, 367 n.158 (1972) (Marshall, J., concurring) (quoting William O. Douglas, "Foreword" to Jerome Frank & Barbara Frank, Not Guilty 11-12 (1957); Goetz v. Crosson, 967 F.2d 29, 39 (2d Cir. 1992) (Newman, J., concurring); Bunnell v. Sullivan, 947 F.2d 341, 352 (9th Cir. 1991) (in banc) (Kozinski, J., concurring); United States v. Greer, 538 F.2d 437, 441 (D.C. Cir. 1976); see also 4 William Blackstone, Commentaries *358.

[5] See Sir John Fortescue, De Laudibus Legum Angliae 65 (S.B. Chrimes ed., Cambridge Univ. Press 1942) (1471) (20 to 1); Thomas Starkie, Evidence 756 (1724), quoted in IX Wigmore on Evidence § 2497, at 409-10 (Chadbourn rev. 1991) (99 to 1).

## Conclusion

The judgment is affirmed with respect to Count I and reversed with respect to Count II.

Appendix



This photograph was taken looking down into the space

between the bottom of the back of the back seat and the back of the back-seat cushion.  The object across the middle of the photograph is a ruler.

12-1221

United States v. Clark –Dissent

DRONEY, *Circuit Judge*, dissenting:

I respectfully dissent from the majority's reversal of Clark's conviction for possession of cocaine. I believe that count of conviction was supported by sufficient evidence for the jury to conclude that Clark was guilty beyond a reasonable doubt.

**I. Factual Background**

The events leading up to Clark's arrest provide important context for Clark's sufficiency of evidence challenge. Shortly before 2:00 a.m. on November 16, 2002, a 911 operator in the Niagara County Sheriff's Department informed police officers that she had just received a call from a woman in a local bar, and that the caller "said that Chris and Jason . . . Richardson . . . [a]re out front in an older white Jeep Cherokee with guns. And they might not be there now but they have been circling the block because they are apparently going to attack somebody when they come out." Officer Scott Snaith of the City of Lockport Police Department took the call from the 911 operator, and knew that the Richardsons had been involved in previous violent crimes. Officer Snaith relayed the information to fellow officers Steven Abbott and Todd Chenez, who then responded to the call.

After conferring briefly, Officers Abbott and Chenez saw the Jeep in a parking lot across from the bar, blocked the Jeep with their two patrol cars and exited their vehicles. With guns drawn, each officer walked along a side of the Jeep. Officer Abbott saw Raymond Flores and Jason Richardson in the back seat of the car, and Christopher Richardson in the front passenger seat. Clark was in the driver's seat. Officer Abbott recognized Flores and the Richardsons from previous incidents. After observing some "nervous" movement from Clark, Abbott ordered the occupants of the car to "place their hands forward." Officer

Abbott then began to question Clark through the open driver's window. Officer Abbott told Clark that the officers were responding to a report of possible firearms, and asked whether there were any handguns in the car. Clark denied that there were any weapons. Officer Abbott then asked Clark to consent to a search, which Clark declined. Other officers began to arrive, and Officer Abbott asked Clark to step out of the car. Officer Abbott saw the butt of a handgun underneath the front of the driver's seat as Clark was getting out of the car.

Officer Abbott did a pat-down of Clark for other weapons and Clark was then handcuffed and placed in the back seat of Sheriff's Deputy Anthony Giamberdino's patrol car. Clark was left alone in the patrol car while Abbott and the other officers seized the handgun and dealt with the passengers in the Jeep. Clark was then transported to police headquarters in Giamberdino's patrol car. Just as Clark was removed from the patrol car, a lighter was found on the back seat. Giamberdino removed it and then pulled up the back seat and discovered loose cocaine underneath the area where Clark had been sitting. Clark was charged with being a felon in possession of the handgun and ammunition, and unlawful possession of the cocaine, and the jury found him guilty of both offenses.

**II. Discussion**

The majority concludes that there was insufficient evidence to affirm the jury's verdict on the drug count. It takes the position that any reasonable jury would inevitably be left with a reasonable doubt as to whether the cocaine found underneath the seat of the patrol car was Clark's. I disagree. A rational jury could have concluded beyond a reasonable doubt that Clark deposited the cocaine

2

underneath the seat of the patrol car. The evidence offered at trial would have permitted the jury to conclude, for example, that Officer Abbott missed the cocaine in his initial weapons pat-down of Clark, and that Clark used his substantial time alone in the patrol car to place the cocaine underneath the back seat. As emphasized in the majority opinion, Officer Abbott patted down Clark for weapons before he was placed in the back seat of the patrol car. The fact that Officer Abbott did not find drugs in this search is significant, but it cannot bear the weight given it by the majority. Officer Abbott conducted the pat-down in a dangerous situation involving at least one weapon. Indeed, Officer Abbott himself had already seen a handgun underneath Clark's seat in the Jeep, and there were still three suspects in the car when Abbott did the pat-down of Clark. Moreover, the officers were on the scene because of a report that an attack involving weapons was imminent. No mention of drugs or a drug transaction was made in the 911 call. Given these facts, it would be entirely reasonable for a jury to credit Officer Abbott's trial testimony that he was only looking for weapons during Clark's pat-down, not drugs. As Officer Abbott testified: "Q. You pat him down for purposes of looking for weapons? A. Correct. Q. Or any contraband? A. Just weapons." Tr. 152. Given the nature of the pat-down and the circumstances surrounding it, it would be quite reasonable to conclude that the cocaine was missed.[1]

---

[1] The record does not appear to indicate how much cocaine was ultimately discovered. However, the

3

Clark was placed in the back seat of Deputy Giamberdino's patrol car and he remained there alone for five to ten minutes while the police were still dealing with the three passengers in Clark's Jeep. Although Deputy Giamberdino testified that he was keeping an eye on his patrol car during that time, his testimony indicates that he was only focused on ensuring that Clark remained in the car, and that no one attempted to release him from the car. Tr. 463 ("Q. At any time that you observed the vehicle, did you see Mr. Clark make any type of motions in the rear of your vehicle? . . . A. I can't really say because of it being dark out and the window - - I was just making sure nobody was going by the vehicle . . . he didn't kick anything out like the window or anything, that's all."); Tr. 473 ("Q. . . . Were you constantly looking at that vehicle, at Mr. Clark in that vehicle during the time he was there and you were at the scene? A. No. I was just mainly watching the vehicle so nobody approached it to let him out. It's happened in the past."). Deputy Giamberdino did not testify that he was looking to see, for example, whether Clark was trying to hide anything in the patrol car during that time. As a result, Clark's opportunity to hide the cocaine beneath the seat was not limited to the period when the officers were in the police car with Clark or transporting him, as the majority suggests. The jury could well have

government charged Clark only with simple possession of the cocaine under 21 U.S.C. § 844(a), as opposed to the offenses that apply to possession with intent to distribute. *See, e.g.,* 21 U.S.C. § 841(b)(1)(A)-(B).

concluded that Clark used his substantial time alone to remove a baggy from his back pocket and empty its contents underneath the seat.

While this may have been difficult because Clark was handcuffed, it was not impossible, and the stakes for Clark were high. Clark would also have been aided by the design of the seat. As explained in testimony at trial, the horizontal part of the seat was designed to open upward from the back (away from the vertical part that forms the back of the seat). Although Clark's hands were cuffed behind his back, he still could have retrieved the cocaine from a back pocket of his pants and emptied the cocaine into the gap between the horizontal and vertical parts of the seat.

The fact that no baggy was found with the cocaine is also understandable. The jury may have reasonably determined that Clark retained the baggy and kept it hidden in his hands or clothes until he was out of the car and could discard it, perhaps out of a concern that the baggy had his fingerprints or other identifying information.

Admittedly, there is no testimony indicating that the officers saw cocaine on Clark's person after removing Clark from the car. However, Giamberdino and another Deputy Sheriff who helped Clark out of the car at the police station—Deputy May—testified that they simply did not check for such traces. Tr. 399 (May did not search Clark's pockets or clothing); Tr. 465-67 (Giamberdino did not look at Clark's clothing or hands as he was being led away from the car). The officers also did not look for a baggy. Tr. 399 (May did not search the patrol car for a baggy); Tr. 469 (Giamberdino did not search the patrol car for a baggy). A reasonable jury could have determined that Clark managed to hide and

5

dispose of an empty baggy without the deputies' knowledge after he was removed from the police car, as he was walked into and through the police station.

In rejecting this series of events, the majority also necessarily rejects the trial testimony of Deputy Giamberdino. Giamberdino specifically testified that he thoroughly checked behind and underneath the back seat of his patrol car for contraband, as he always did before starting a shift. Giamberdino further testified that no one other than Clark had access to that area of the patrol car that evening. It was certainly reasonable for the jury to conclude from this testimony that Clark was the only possible source of the cocaine.

Indeed, it is essentially impossible to square Deputy Giamberdino's testimony with the majority's position that there was insufficient evidence to convict Clark on the drug count of the indictment. Either the majority suspects that police officers planted the drugs in order to implicate Clark, or that Deputy Giamberdino was somehow mistaken in his sworn testimony that he inspected underneath the seat before Clark was placed in the car, as was his usual practice, including pulling the back seat forward and checking under it. It would also seem odd that, if police officers intended to "plant" drugs on Clark they would have done it in this way. Why would officers place the drugs there and in that way, instead of simply leaving a baggy with cocaine in it on top of the seat? And why would officers go to that trouble, given that they already had a very strong case against Clark on the more serious offense of possessing a firearm? The idea that Deputy Giamberdino was mistaken about having inspected underneath the seat before Clark entered raises further concerns. Giamberdino testified very

6

specifically and repeatedly that he had checked beneath the rear seat at the beginning of every shift, as well as that night. Tr. 439-43. And if the drugs were in the car before Clark got in, where would they have come from? Were they placed there by some prior prisoner?[2] Was it possible that a previous prisoner— a prisoner who was undoubtedly patted down like Clark, handcuffed like Clark, and supervised like Clark emptied the cocaine underneath the seat? If so, why is it so unlikely that Clark did it? Given the absence of a more plausible innocent explanation, it was not unreasonable for the jury to find as it did.

There is also Clark's spontaneous statement, "I'll confess to everything if you let my cousins go." Tr. 487. If Clark made this statement after being confronted with the cocaine in the back seat of the patrol car, the jury may well have concluded that Clark was offering to confess to possession of the cocaine, as well as the weapons offense. Contrary to the majority's assertion, there was a basis for the jury's conclusion that Clark knew that the cocaine had been discovered at the time he volunteered to confess. Deputy Giamberdino specifically testified that Clark was present when he discovered the cocaine, and that Clark was present when Giamberdino called out, "I got powder back here." Tr. 466-67. As a result, the jury could easily have concluded that Clark was

---

[2] Deputy May, who was assigned to that patrol car with Giamberdino, also testified that no one other than Clark had been in the back seat of the patrol car that evening and that the drugs were not underneath the back seat before Clark was placed there.

7

aware that he would also be charged with cocaine possession at the time that he offered to "confess to everything."

Appellate courts must not abdicate their role in ensuring that convictions are supported by adequate evidence. Here, however, the evidence was sufficient to permit a reasonable jury to find Clark guilty beyond a reasonable doubt of possession of cocaine. "[I]t is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. . . . Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Cavazos v. Smith*, 132 S.Ct. 2, 4 (2011) (per curiam).